# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

OLIVIA COLEY-PEARSON

    Plaintiff,

    v.                                          5:20-CV-151

EMILY MISTY MARTIN,
aka MISTY HAYES, et al.,

    Defendants.

_____

## ORDER

    Before the Court is a motion for summary judgment filed by Defendants Emily Misty Martin and Coffee County.  Dkt. No. 69. This case has been thoroughly litigated by excellent lawyers who have briefed and contested a dozen aspects of First Amendment law. Ultimately, the Defendants prevail on the First Amendment claim for the most basic reasons briefed by the parties: the Criminal Trespass Warning Plaintiff complains violated her First Amendment right was neither drafted nor issued by either of the remaining Defendants.  For the sake of thoroughness, the Court has wrestled with the alternative arguments.  Upon close examination, Defendants prevail.

## FACTUAL BACKGROUND

Plaintiff Olivia Coley-Pearson, a city commissioner in Douglas, Georgia, is actively involved in helping people in Coffee County exercise their right to vote.  Dkt. No. 72 at 15:8-14, 29:10-15, 80:5-8, 81:19-25, 132:24-135:8, 201:5-11, 229:18-30.  On October 27, 2020, Plaintiff visited a Coffee County voting precinct located at 224 West Ashley Street, in Douglas, Georgia (the "Polling Place") on at least two occasions.  Dkt. No. 72 at 29:20-22, 32:5-8, 37:10-15, 52:1-22, 53:5-10; Dkt. No. 69-4.  First, Plaintiff completed paperwork to assist a voter, Crystal Hill, whom Plaintiff accompanied to a voting machine.  Dkt. No. 72 at 37:10-15.  Second, Plaintiff drove another voter, Rolanda Williams, to the Polling Place.  Id. at 52:1-22, 53:5-10; Dkt. No. 69-4.

During Plaintiff's visit to the Polling Place with Hill, after Hill voted, Plaintiff walked with Hill to a ballot scanner machine where Plaintiff asked a poll worker, Ms. JoAnne Andrews, "what were the red and green buttons for."  Dkt. No. 72. at 39:12-25, 40:1-5, 99:10-13.  According to Plaintiff, Andrews responded that "she did not know."  Id. at 99:14-18.

Afterwards, Defendant Emily Misty Martin, who at the time was an elections supervisor for Defendant Coffee County Board of Elections ("Coffee County" or "Board of Elections"), dkt. no. 75 at 83:3-8, approached Plaintiff "and began hollering" at her in a loud, firm voice, telling Plaintiff, "don't touch any buttons,"

2

dkt. no. 72 at 40:14-16, 45:13-18, 99:19-23, 100:2-9.  Plaintiff then asked Defendant Martin what the buttons on the machine were for, and Defendant Martin responded that she did not know, to which Plaintiff replied, "so you're the supervisor and you don't know?" Dkt. No. 72 at 46:13-15.  Defendant Martin continued to "holler[] to the top of her lungs" and "hollered out, call 911."  Id. at 46:11-16.  As Plaintiff made her way to the Polling Place's exit, Defendant Martin continued to yell at Plaintiff, stating, "that's what you got in trouble for before."  Id. at 46:22-25, 105:18-25. At that point, Plaintiff yelled at Defendant Martin, "you told a lie before like you're telling a lie now."  Id. at 47:2-3, 104:17-25.

After Plaintiff left, City of Douglas Police Officer Joe Stewart reported to the Polling Place "and [was] asked to ban [Plaintiff] from the premises."  Dkt. No. 69-4; Dkt. No. 72 at 117:14-118:15; see generally Dkt. No. 69-5 (City of Douglas Police Department incident report).  The audio recording of Officer Stewart's bodycam reflects Officer Stewart making the initial suggestion that Plaintiff be banned from the Polling Place "unless she is actually voting."  Dkt. No. 85, Ex. 3, at 0:04:47.  Then, Defendant Martin responds that Plaintiff is "impeding [Defendant Martin's] ability to do [her] job," and states, "that's in the code book."  Id. at 0:05:06.  Defendant Martin then informs Officer Stewart that Hill, the voter Plaintiff had assisted, is not

illiterate, despite Plaintiff's representation that Hill could not read or write English, and that Plaintiff touched buttons on the ballot scanner machine. <u>Id.</u> at 0:07:35-0:09:00. Defendant Martin then states to Officer Stewart, "I don't care what I've got to file, what I've got to do, she is not to come back in my office. If I have to say I feel threatened, I don't care. Because I do . . . She was all up in my face." <u>Id.</u> at 0:09:52.

Officer Stewart conducted his own investigation and determined that Plaintiff had allegedly touched buttons on the voting machine and had an "intense verbal exchange" with [Defendant] Martin. Dkt. No. 76 at 19:20-20:25; Dkt. No. 69-5 at 4-5 (Officer Stewart's statement in the incident report); Dkt. No. 85, Ex. 3, at 0:16:18 (Officer Stewart's conversation with City of Douglas Chief of Police at the time, Shane Edminstin, determining next steps and discussing issuing a criminal trespass warning). Officer Stewart and Chief Edminstin then told Defendant Martin to contact the county attorney and a majority of the members of the Board of Elections to ensure Defendant Martin had the authority to request a trespass warning. Dkt. No. 85, Ex. 3, at 0:20:44, 0:28:40. Coffee County Board of Elections member Ernestine Clark, who was present during the incident, agreed that Defendant Martin had that authority, and members Matthew McCullough and Eric Chaney agreed via phone, in Officer Stewart's presence, that Defendant Martin had that authority. Dkt. No. 76 at 23:4-24:18.

4

Later that same day, Plaintiff returned to the Polling Place with the second voter, Williams, whom Plaintiff drove to the Board of Elections office to retrieve an identification card so that Williams could vote.  Dkt. No. 72 at 52:1-25.

Once Plaintiff returned to the Polling Place, Officer Stewart was called back there, and upon his arrival Defendant Martin informed Plaintiff that she was "banned from this parking lot, banned from this premises."  Dkt. No. 78, Ex. E, at 0:01:30 (bodycam audio of Plaintiff's arrest).  Officer Stewart then told Plaintiff he needed to provide her with some paperwork regarding the ban and asked for Plaintiff's identification card.  Id. at 0:01:40.  Plaintiff then informed Officer Stewart that Williams wanted to get an identification card, and Officer Stewart told Plaintiff that Williams was free to go get her card, but that Plaintiff needed to "stay here with [him]," because she was banned for disruptive behavior.  Id. at 0:01:50.  At this point, Plaintiff responds "she's telling a lie," and again refused Officer Stewart's request for her driver's license, while contesting the truthfulness of the accusations, asking how she was being disruptive, and what witnesses shared with Officer Stewart.  Id. at 0:02:02-57.  Officer Stewart then seemingly walked away to prepare "paperwork."  Id.[1]

---

[1] In the audio recording, Officer Stewart is heard stating, "stay here with her please, I'll be back with you in a minute," dkt. no.

Officer Stewart then returned and informed Plaintiff that she was banned from any polling place in Coffee County and gave Plaintiff the Criminal Trespass Warning ("Criminal Trespass Warning" or the "Warning"). Dkt. No. 72 at 116:9-118:15; Dkt. No. 78, Ex. E, at 0:15:00; Dkt. No. 69-4. The Criminal Trespass Warning applies to the "PUBLIC Venue" located at "BOARD OF ELECTIONS 224 W ASHLEY ST, DOUGLAS, GA 31633," "during the time of voting or any other Board of Elections business," and includes "property not at 224 West Ashley Street but being lawfully used by the [B]oard." Dkt. No. 69-4. The Warning is directed only to Plaintiff and allows Plaintiff to be at a Coffee County polling place only to vote. Id.; Dkt. No. 72 at 119:14-22. The Warning states that "the above named person[, Plaintiff,] was advised that if they returned onto said property that they would be in violation of applicable provisions of Georgia law, O.C.G.A. § 16-7-21, prohibiting trespass, and be subject to arrest." Dkt. No. 69-4. A portion of the Warning labeled "additional comments," states:

> On 10/27/2020 at 1132 hours I, Sergeant Joe Stewart, was summoned to 224 West Ashley Street and asked to ban [Plaintiff] from the premises. This also extends to any polling place that is controlled by the Coffee County Board of Elections during the time of voting or any other Board of Elections business. This will include property not at 224 West Ashley Street but being lawfully used by the [B]oard[.] [Plaintiff] is being banned for

---

78, Ex. E, at 0:02:50-57, followed by a considerable silence, until Officer Stewart is heard seemingly returning to where Plaintiff is located to present her with the Criminal Trespass Warning, id. at 0:14:57.

> disruptive behavior. She may only come to a polling place
> in order to vote and she has already cast her ballot for
> this year[']s election. She was told that she was banned
> by election supervisor [Defendant] Misty Martin.

Id.; Dkt. No. 72 at 117:14-118:15 (Plaintiff's deposition testimony acknowledging the contents of the Warning).

After Officer Stewart explained the Warning's contents, Plaintiff asked him what the Warning was based on, to which Officer Stewart replied that his findings will be available in a police report that Plaintiff can request. Dkt. No. 78, Ex. E, at 0:15:00-0:15:31. Plaintiff continued to ask the basis of the Warning and asked Officer Stewart what she could do to raise her concerns regarding Defendant Martin yelling at her. Id. at 0:15:31-0:16:00. Officer Stewart then, again, asked Plaintiff to leave, but Plaintiff refused to leave until Williams could retrieve her identification card. Id. at 0:16:00-0:16:48. Accordingly, Officer Stewart, along with City of Douglas Officer Robert Sprinkle, arrested Plaintiff for refusing to leave the Polling Place after being asked to leave, in violation of the Criminal Trespass Warning. Id. at 0:16:48; Dkt. No. 72 at 120:3-12, Dkt. No. 87 ¶ 10. The decision to arrest Plaintiff was made "entirely" by Officer Stewart. Dkt. No. 76 at 72:1-5.

The 2020 General Election was held on November 3, 2020, and early in-person voting for the January 2021 runoff began on December 14, 2020. Accordingly, the Criminal Trespass Warning was

in effect while voting was open from October 27 through November 3, 2020, and from December 14-17, 2020.

**PROCEDURAL BACKGROUND**

Plaintiff filed her complaint on December 11, 2020 against Defendant Martin in her official and individual capacity, Defendant Coffee County, by and through the Coffee County Board of Elections, the City of Douglas, and City of Douglas Officers Joe Stewart, Robert Sprinkle and Shane Edmisten, in their official and individual capacities. Dkt. No. 1 at 1, 15. Plaintiff simultaneously filed a motion for preliminary injunction, seeking an injunction of the Criminal Trespass Warning's enforcement. Dkt. No. 5. However, on December 17, 2020, the Parties filed a stipulation withdrawing Plaintiff's motion for preliminary injunction and stipulating that the Criminal Trespass Warning would not prohibit Plaintiff from accessing any polling place or other property identified in the Warning "for any lawful purpose." Dkt. No. 10 ¶¶ 1-2. Defendants did not concede, however, that the Criminal Trespass Warning was unlawful on the day it was issued. Id. ¶ 2 n.1. Plaintiff has since voluntarily dismissed Defendants City of Douglas, Joe Stewart, Robert Sprinkle and Shane Edmisten (the "City Defendants") from the case. Dkt. No. 38. Plaintiff's

claims against Defendants Martin and Coffee County remain pending.[2]
Id.

Plaintiff alleges against Defendants Martin and Coffee County claims for violation of her First Amendment rights, pursuant to 42 U.S.C. § 1983, dkt. no. 53 ¶¶ 37-42; claims for retaliation in violation of the First Amendment, pursuant to § 1983, id. ¶¶ 49-55; and claims for unlawful seizure in violation of the Fourth Amendment, pursuant to § 1983, id. ¶¶ 43-48.

Defendants Martin and Coffee County now move for summary judgment on all of Plaintiff's claims. See Dkt. No. 69.

### LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). Factual disputes that are "irrelevant or

---

[2] Defendant Martin was dismissed from the Coffee County Board of Elections; therefore, Plaintiff is pursuing claims against Defendant Martin only in her individual capacity. Dkt. No. 35 at n.1.

unnecessary" are not sufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325.

If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not

only proper but required." <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

**DISCUSSION**

## I.   **Plaintiff has standing.**

As an initial matter, Defendants contend Plaintiff lacks Article III standing to bring this action because Plaintiff has not suffered an injury-in-fact. Dkt. No. 69-2 at 13. She has.

Litigants must have standing to properly invoke the jurisdiction of federal courts. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). Plaintiff must show (1) "that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury is traceable to—that is, 'was likely caused by'—the defendant's legal violation, and (3) 'that the injury would likely be redressed by judicial relief.'" <u>Walters v. Fast AC, LLC</u>, 60 F.4th 642, 647 (11th Cir. 2023) (quoting <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190, 2203 (2021)). Accordingly, "in response to a summary judgment motion, 'the plaintiff . . . must "set forth" by affidavit or other evidence specific facts' showing he was injured by the defendant's legal violation, in a manner amenable to judicial relief." <u>Id.</u> (quoting <u>Ga. Republican Party v. Secs. & Exch. Comm'n</u>, 888 F.3d 1198, 1201 (11th Cir. 2018)).

Defendants contest the injury-in-fact requirement, contending Plaintiff lacks standing because "driving someone home from a

polling location is not constitutionally protected expressive conduct," and because Plaintiff "made no [] effort to return to any Coffee County polling location or place that was subject to the ban." Dkt. No. 69-2 at 13.

The requirement that a plaintiff suffer an injury-in-fact helps "ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citations omitted).  To satisfy this requirement, Plaintiff must show "that ... she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Walters, 2023 WL 1771643 at *3 (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016)).  An injury is "concrete," "'if it actually exists'—meaning, it is 'real and not abstract.'" Id. (citations omitted).  An injury is "particularized," if it "affects the plaintiff in a personal and individual way." Id. (alteration accepted)(citations omitted).

As an initial matter, Defendants' contention that Plaintiff had to attempt to return to the Polling Place, or any other location within the Warning's scope, to have standing is misplaced. It is well established that "[w]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." MedImmune, Inc. v. Genentech, Inc., 549 U.S.

118, 128-129 (2007); see also Driehaus, 573 U.S. at 158-59 (citing Steffel v. Thompson, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights")). Instead, Plaintiff must prove "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Driehaus, 573 U.S. at 159 (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)).

Moreover, the injury-in-fact requirement applies "most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." Harrell v. Fla. Bar, 608 F.3d 1241, 1254 (11th Cir. 2001) (citing Hallandale Prof'l Fire Fighters Loc. 2238 v. City of Hallandale, 922 F.2d 756, 760 (11th Cir. 1991)). So, "an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance[,] . . . the injury is self-censorship." Pittman v. Cole, 267 F.3d 1269, 1283 (11th Cir. 2001) (quoting Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998)).

Next, Defendants' contention that Plaintiff lacks standing because "driving a person, who does not need assistance voting,

home from a polling location is not constitutionally protected, expressive conduct" is misplaced.  Dkt. No. 100 at 2.

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994).  While the First Amendment explicitly forbids the abridgment of "speech," it is well established that its protections also extend to conduct that "may be 'sufficiently imbued with elements of communication to fall within [its] scope.'" Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. Washington, 418 U.S. 405, 409 (1974)); see also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale ("FLFNB"), 901 F.3d 1235, 1240 (11th Cir. 2018) ("The First Amendment guarantees 'all people [ ] the right to engage not only in "pure speech," but "expressive conduct" as well.'" (alteration in original) (quoting Holloman ex rel Holloman v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004)).

Whether conduct is sufficiently expressive depends on: (1) whether "[a]n intent to convey a particularized message was present" and (2) whether "in the surrounding circumstances the

14

likelihood was great that the message would be understood by those who viewed it." FLFNB, 901 F.3d at 1240 (alteration in original) (quoting Spence, 418 U.S. at 410-11).   However, a "narrow, succinctly articulable message is not a condition of constitutional protection." Id. (quoting Hurley v. Irish-Am., Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 569 (1995)). Rather, the question is "whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." Id. (quoting Holloman, 370 F.3d at 1270).

The Supreme Court has applied this test to protect many different activities as "expressive conduct" under the First Amendment.   See e.g., Spence, 418 U.S. at 409 (superimposing a peace sign on a flag conveying that America stood for peace); Brown v. Louisiana, 383 U.S. 131, 141-42 (1966) (participating in a sit-in demonstration to protest segregation); Buckley v. Valeo, 424 U.S. 1, 19 (1976) (political campaign contributions).   However, the Supreme Court has limited First Amendment protection to only "conduct that is inherently expressive." Rumsfeld v. Forum for Acad. & Inst. Rts., Inc., 547 U.S. 47, 66 (2006).   Accordingly, "[c]onduct is inherently expressive when it 'comprehensively communicates its own message without additional speech'—or put slightly differently, when the conduct '*itself* conveys a message that can be readily understood by those who view it.'" McDonald

v. City of Pompano Beach, 556 F. Supp. 3d 1334, 1348 (S.D. Fla. 2021) (alterations accepted).   "Indeed, the Supreme Court has rejected the view that 'an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'"   In re Ga. Senate Bill 202, 622 F. Supp. 3d 1312, 1327 (N.D. Ga. 2022) (quoting United States v. O'Brien, 391 U.S. 367, 376 (1968)); see also Rumsfeld, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

Notably, the Supreme Court has held First Amendment protection extends to efforts to expand political expression opportunities and engagement.   Meyer v. Nebraska, 486 U.S. 414, 421–22 (1998); Buckley v. Am. Const. L. Found., Inc., 525 U.S. 182 (1999).   In Meyer, the Supreme Court held petition circulation is "core political speech," because it involves "interactive communication concerning political change."   486 U.S. at 421–22; see also Priorities USA v. Nessel, 462 F. Supp. 3d 792, 819 (E.D. Mich. 2020) (finding diminution of "rides-to-the-polls" efforts and opportunities unconstitutional under Meyer and Buckley); Guffey v. Mauskopf, 45 F.4th 442, 451 (D.C. Cir. 2022)("Absent the belief that precedent directs it, there is no reason to treat driving voters to the polls and organizing political events differently . . . They all implicate core First Amendment rights."

16

(citing Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971)). Thus, the Court finds Plaintiff's voter transportation efforts are sufficiently expressive to confer standing.

Even if Plaintiff's voter transportation efforts do not fall under Meyer, Plaintiff has shown her voter efforts are sufficiently expressive to confer standing.  In FLFNB, the Eleventh Circuit held that a charity's distribution of food in a public park constituted expressive conduct because the charity "established an intent to 'express[] an idea through activity,' and the reasonable observer would interpret its food sharing events as conveying some sort of message."  901 F.3d at 1243 (first quoting Spence, 418 U.S. at 411; and then citing Holloman, 370 F.3d at 1270).  In reaching that conclusion,

> The FLFNB court found the following facts instructive: (i) the event occurred at a park, which is a traditional public forum; (ii) the charity set up tables and banners and distributed literature in the park, which distinguished the event from a social gathering of friends and family; (iii) the event was open to anyone present in the park, which the court found had social implications "in and of itself," (iv) the charity's message concerned an issue of concern in the community (homelessness), which had attracted attention from city officials and local media; and (v) the use of food as a means to convey a message had specific significance and "date[d] back millennia."  These surrounding circumstances, although not individually dispositive, together compelled the court to conclude that the charity's food-sharing events belonged "on the expressive side of the ledger." In sum, the court found that the charity had demonstrated an intent to express an idea through activity and that a reasonable observer would interpret the events as conveying that message.

17

In re Ga. Senate Bill 202, 622 F. Supp. 3d at 1328 (citing FLFNB, 901 F.3d at 1242-44).

By contrast, in Rumsfeld, the Supreme Court addressed a challenge to a statute penalizing schools for refusing to allow United States military recruiters to conduct interviews on-campus due to the military's policies regarding homosexual service.  547 U.S. at 51.  The Supreme Court held the exclusion of military recruiters was not inherently expressive conduct because,

> An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else.

Id. at 66.  The Supreme Court further explained, "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under O'Brien."   Id.; see also id. ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

Defendants' contention that Plaintiff must have attempted to advocate a "political belief" or other specific message misses the mark.  Dkt. No. 100 at 3.  All Plaintiff is required to show is that a reasonable person "would interpret [her conduct] as *some* sort of message, not whether an observer would necessarily infer

a *specific* message." <u>Holloman</u>, 370 F.3d at 1270; <u>see also</u> <u>Hurley</u>, 515 U.S. at 569 ("[A] narrow, succinctly articulable message is not a condition of constitutional protection.").

The record evidence shows that Plaintiff intended to convey the message that voting rights and participation are important in order to encourage people, particularly voters in the Black community, to vote. Dkt. No. 84 at 5. For instance, when the Criminal Trespass Warning was issued and Plaintiff was arrested, Plaintiff was driving a voter to the Polling Place to procure an identification card "and then hopefully to vote." Dkt. No. 72 at 53:1-10; <u>Id.</u> at 52:1-25; Dkt. No. 87 ¶ 6; Dkt. No. 69-1 ¶ 6. Plaintiff's declaration explains that she

> Encourage[s] everyone in [her] community to vote and [] offer[s] transportation to and from the polls for people who do not have their own mode of transportation. With SRBWI and Black Voters Matter, [she] also organize[s] volunteers to provide transportation to voters who need it. [She] do[es] this because many low-income people, especially Black people, are hesitant or afraid to vote due to the history of voter intimidation and suppression in the South. The lack of transportation can also prevent many Black people and low-income people from exercising their right to vote. [She] engage[s] in this voter turnout work in every election and ha[s] done so since at least [sic] 1990s.

Dkt. No. 84-2 ¶ 8.

Plaintiff's deposition testimony also demonstrates that she regularly assists voters in all elections, except for the ones where she is up for election, including, but not limited to

coordinating and transporting voters who need transportation.  See Dkt. No. 72 at 81:19-25, 132:24-135:8, 201:5-11.

What's more, the record also shows that community members infer "some" message from Plaintiff's various voter-focused efforts.  See Dkt. No. 88 at 14:7-16:11 (Larry Nesmith, an elections observer, testifying that Plaintiff is "well-known in the community" for community service, that she is "outspoken" and that "[i]f she believes in something she's going to fight"); Dkt. No. 76 at 40:8-41:17 (Officer Stewart testifying that he is familiar with Plaintiff's voting rights advocacy, Plaintiff's efforts with Black Voters Matter, and Plaintiff's assisting and encouraging people to vote, and that he is unsure if Plaintiff works directly with a particular political party).

So, like in FLFNB, where the court, "focus[ing] on the context of the charity's food sharing events," concluded that the charity's events, on the backdrop of an election, conveyed a message "that [] society can end hunger and poverty if . . . collective resources [were redirected] from the military and war and that food is a human right," here, Plaintiff's demonstrated history and reputation of voter advocacy in the community, Plaintiff's efforts to provide transportation to at least one voter on the day of the incident, as well as her general efforts to encourage people to vote by providing them with water, food, and transportation, among other things, convey the message that voting is important.

The record evidence also shows a cognizable injury to Plaintiff's constitutional right. Plaintiff testified in her deposition that, "[h]ad [she] not went [sic] to jail [she] would have assisted others." Dkt. No. 72 at 199:24-25. Moreover, Plaintiff's declaration states that because of the Criminal Trespass Warning, she "was not able to assist and encourage voters as [she] usually would for the rest of the early voting period of the 2021 runoff election," that she "did not try to assist anyone with voting because [she] was afraid that [she] would be arrested, jailed, and prosecuted again if [she] set foot on any property—including a parking lot—controlled by the Coffee County Board of Elections," and that she "was also afraid that [Defendant] Martin or someone else on the Board of Elections would have [her] arrested if they saw [her] dropping someone off at the polls, so [she] did not drive people to and from the polls as [she] normally would have in prior elections." Dkt. No. 84-2 ¶ 13.

Plaintiff's declaration further states that she "was unable to verbally encourage persons to vote as [she] normally would on election day," and she did not participate in a gathering with "SRBWI and Black Voters Matter" "on public property in downtown Douglas to offer encouragement and support to voters through food, words, music, and signs," because she "was afraid that [Defendant] Martin or someone else on the Board of Elections would accuse [her] of breaking the law and have [her] arrested, jailed, and prosecuted

again." Id. ¶ 14.   Plaintiff's declaration concludes by
explaining,

> If [she] had not been banned from all polling locations,
> [she] would have driven more voters to the polls and
> assisted more voters during the 2020 general election
> and the early voting period of the 2021 runoff election
> because that is the work that [she] always do[es] during
> elections. [She] also would have been able to more
> broadly encourage voter participation as [she] would
> have been able to verbally interact with citizens and
> potential voters in the areas where [she] was barred.

Id. ¶ 15.

Plaintiff has sufficiently demonstrated that providing voters
transportation to and from the polls and her other get-out-the-
vote efforts constitute expressive conduct protected by the First
Amendment, and she has demonstrated a cognizable injury to that
right.  Accordingly, Plaintiff has standing.

## II.  Plaintiff's First Amendment Claims

In the amended complaint, Plaintiff does not allege that
Defendants' initial decision to remove her from the Polling Place
was an impermissible restriction on her speech.   Instead, she
challenges the Criminal Trespass Warning's constitutionality as "a
policy and practice" and a "decision of final policymakers" of
Coffee County.  Dkt. No. 53 ¶¶ 37-42.  Defendants contend summary
judgment is warranted on Plaintiff's First Amendment claim because
the Criminal Trespass Warning was not drafted by Defendants, and,
alternatively, because the Warning applies to a nonpublic forum,
does not require a strict scrutiny analysis, and was reasonable

and viewpoint neutral.  Dkt. No. 69-2 at 22-27; Dkt. No. 100 at
10.  Plaintiff, on the other hand, argues the Criminal Trespass
Warning is Defendants' policy and practice, and that the Warning
applies in a traditional public forum such that strict scrutiny
analysis is appropriate.  Dkt. No. 84 at 7-11; Dkt. No. 102 at 6-
7.  Plaintiff also objects to the Criminal Trespass Warning on
overbreadth and vagueness grounds, dkt. no. 84 at 20-22, and
contends it was an indefinite prior restraint entered with
Defendants' unbridled discretion, id. at 18-19.

As an initial matter, Plaintiff's First Amendment claims fail
because Defendants did not draft or issue the Criminal Trespass
Warning.  A county is liable under 28 U.S.C. § 1983 only when its
"official policy" causes a constitutional violation.  Monell v.
Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  So, Plaintiff
"has two methods by which to establish a county's policy: identify
either (1) an officially promulgated county policy or (2) an
unofficial custom or practice of the county shown through the
repeated acts of a final policymaker for the county." Grech v.
Clayton Cnty., 335 F.3d 1326, 1329 (11th Cir. 2003) (citations
omitted).  "A single incident would not be so pervasive as to be
a custom or practice." Id. at 1330 n.6 (plurality opinion) (citing
City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)
(explaining that when establishing liability for a custom or
practice, "[p]roof of a single incident of unconstitutional

activity is not sufficient to impose liability under <u>Monell</u>")). However,

> A government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood.

<u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986) (footnote omitted).

> Under either avenue, a plaintiff (1) must show that the local governmental entity, here the county, has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue.

<u>Grech</u>, 335 F.3d at 1330 (citations omitted).

Plaintiff has presented no evidence to show that the Criminal Trespass Warning issued by the City of Douglas is a policy of the County or an unofficial custom or practice of the County.[3]

The record shows the Criminal Trespass Warning was issued by City of Douglas police officer Joe Stewart, not any of the

---

[3] Notably, Plaintiff does not challenge Defendant Martin's *decision* to ask Plaintiff to leave the Polling Place earlier in the day, nor does Plaintiff challenge Defendant Martin's statement to Plaintiff that she was banned from the Polling Place upon her return. Plaintiff's allegations are as to the *Criminal Trespass Warning* itself. <u>See</u> Dkt. No. 53 ¶¶ 37-42 (Count One challenging the Criminal Trespass Warning). Even if Plaintiff did allege that Defendant Martin's decision to request the Warning was unconstitutional, which she does not, that decision did not violate the First Amendment. <u>See</u> <u>infra</u> pp. 26-63.

remaining Defendants.   Dkt. No. 76 at 70:2-8 (Officer Stewart testifying that the language of the Warning came "entirely" from him); Id. at 61:25-65:20 (Officer Stewart testifying that Defendant Martin had the proper authority over the Polling Place to request the Warning and describing the process he used in drafting and issuing the Warning to Plaintiff); see also Dkt. No. 69-16 at 2 (Defendant Martin's signed affidavit stating that the Warning "was drafted and issued" by City of Douglas Officers Stewart and Sprinkle, that Defendant Martin "left it entirely up to the city officers as to scope, breadth and duration of the" Warning, and that she "did not participate in any way with drafting" the Warning).   In fact, Plaintiff concedes as much.   Dkt. No. 72 at 118:5-11 (Plaintiff's deposition testimony stating "[a]s far as I know it was, because I was trying to get clarification about why I couldn't be there, and he went to his car, printed something, came back and gave it to me" when asked whether the paragraph of the Warning under "additional comments" was drafted by Officer Stewart); Id. at 123 (Plaintiff's deposition testimony stating that "what I have in front of me . . . was written by Officer Stewart," and referring to the Warning as "Officer Stewart's trespass warning.").

Moreover, a look at the Criminal Trespass Warning itself reveals it is titled "City of Douglas Police Department Trespass Warning."   Dkt. No. 69-4.   Despite Plaintiff's insistence, and in

the face of Officer Stewart's testimony explaining otherwise, Plaintiff has presented no evidence that the Warning was issued by Defendant Martin or the Board of Elections, nor has Plaintiff brought forth any evidence that the Warning was an official policy of the County or the Board of Elections such that the remaining Defendants can be liable for it.  Dkt. No. 87 ¶ 10; see generally Dkt. No. 76 at 61:13-72:23.[4]

A. **The Criminal Trespass Warning, in this context, does not violate the Constitution.**

Even if the Court imagines that the Criminal Trespass Warning had been drafted and issued by Defendant Martin or the Board of Elections, Plaintiff's First Amendment claim still fails because the Warning applies to a nonpublic forum and is a content and viewpoint-neutral restriction that was not unreasonable on the backdrop of Plaintiff's admitted disruption at the Polling Place.

1. **The Criminal Trespass Warning applies to a nonpublic forum.**

"The existence of a right of access to public property and the standard by which limitations upon such a right must be

---

[4] In other words, Plaintiff asks the Court to infer that Defendant Martin is the County's final policymaker such that *the County* is liable for a Criminal Trespass Warning that was issued by Officer Stewart—a *City of Douglas* police officer—without pointing to any evidence or case law in support.  Regardless of whether the Board of Elections delegated to Defendant Martin the authority to request the removal of persons from the Polling Place, that alone is insufficient to show that *Defendant Martin* or *the County* is liable for a Criminal Trespass Warning issued by a *City of Douglas* police officer.

evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Loc. Educators Ass'n, 460 U.S. 37, 44 (1983). First Amendment disputes in the public property context are analyzed according to the "public forum doctrine" which includes three types of public property: a traditional public forum, designated public forum, and public property which is not a forum by designation or tradition, often referred to as a "nonpublic" forum. Id. at 45-46.

Under the public forum doctrine, "regulations on speech in traditionally public fora such as municipal sidewalks and parks are subject to strict scrutiny, as are regulations in fora designated by the government to be used for expressive activities." Int'l Soc. for Krishna Consciousness Mia., Inc. v. Metro. Dade Cnty. ("ISKCON"), 147 F.3d 1282, 1285 (11th Cir. 1998) (citations omitted). "Quintessential public forums" include

> [P]laces which by long tradition or by government fiat have been devoted to assembly and debate, [where] the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."

Perry, 460 U.S. at 45 (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)). In these areas, "the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve

a compelling state interest and that it is narrowly drawn to achieve that end." Id. (citing Carey v. Brown, 447 U.S. 455, 461, (1980)). The government may also pass constitutional muster by "enforc[ing] regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id. (citations omitted).

On the other hand, the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." Id. at 46 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'n, 453 U.S. 114, 129 (1981)). Government property that is not a traditional or designated public forum is considered "nonpublic." ISKCON, 147 F.3d at 1285 ("All other government property is nonpublic.").[5] So, in addition to reasonable time, place, and manner restrictions, "the government may restrict speech in nonpublic fora as long as the restrictions are reasonable and viewpoint-neutral." Id. (citing Int'l Soc. for Krishna Consciousness, Inc. v Lee, 505 U.S. 672, 679 (1992)). In nonpublic fora, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Perry, 460 U.S. at 46

---

[5] Neither party argues, and the Court does not find, that the third category within the public forum doctrine—a designated public forum, property which the state opens for expressive activity—applies in this case. See Perry, 460 U.S. at 45.

(first quoting <u>Greenburgh Civic Ass'n</u>, 453 U.S. at 129; then citing <u>Greer v. Spock</u>, 424 U.S. 828, 836 (1976); and then citing <u>Adderley v. Florida</u>, 385 U.S. 39, 48 (1966)); <u>see also</u> <u>United States v. Kokinda</u>, 497 U.S. 720, 725 (1990) ("It is a long-settled principle that governmental actions are subject to a lower level of First Amendment scrutiny when 'the governmental function operating . . . [is] not the power to regulate or license, as lawmaker, . . . but, rather, as proprietor, to manage [its] internal operation[s] . . . .'" (alterations in original) (quoting <u>Cafeteria & Rest. Workers v. McElroy</u>, 367 U.S. 886, 896 (1961))).

"The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business, but its action is valid in these circumstances unless it is unreasonable, or, as was said in <u>Lehman</u>, 'arbitrary, capricious, or invidious.'" <u>Kokinda</u>, 497 U.S. at 725-26 (quoting <u>Lehman v. City of Shaker Heights</u>, 418 U.S. 298, 303 (1974)). After identifying the forum's designated classification—traditional public forum, designated public forum, or nonpublic forum, the "specific characteristics of the forum" dictate whether the governmental restriction at issue is constitutional. <u>Naturalist Soc. v. Fillyaw</u>, 958 F.2d 1515, 1521–22 (11th Cir. 1992).

The Parties do not dispute that the *interior* of the Polling Place in the instant case is a nonpublic forum. Dkt. No. 100 at

10; Dkt. No. 102 at 7; see also Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1886 (2018) ("A polling place in Minnesota qualifies as a nonpublic forum. It is, at least on Election Day, government-controlled property set aside for the sole purpose of voting. The space is 'a special enclave, subject to greater restriction.'" (quoting Lee, 505 U.S. at 680)); id. ("[W]hile the four-Justice plurality in Burson and Justice Scalia's concurrence in the judgment parted ways over whether the public sidewalks and streets surrounding a polling place qualify as a nonpublic forum, neither opinion suggested that the interior of the building was anything but." (first citing Burson v. Freeman, 504 U.S. 191, 196–97 & n.2 (1992) (plurality opinion); and then citing Burson, 504 U.S. at 214–216 (Scalia, J. concurring))). To the extent Plaintiff asserts the Polling Place itself, or any Coffee County polling place or any building where Board of Elections business is conducted, is a traditional public forum, she has identified no record evidence or case law to show any of these buildings is a traditional public forum or that they were intentionally "held open for the use of the public for expressive activities." United States v. Grace, 461 U.S. 171, 178 (1983).

Therefore, the Court must determine whether the Criminal Trespass Warning's enforcement in the parking lot of the Polling Place transforms the Warning's scope to apply to a traditional public forum. It does not.

Whether government property is a nonpublic forum or a traditional or designated public forum depends on the nature of the forum, but also the government's intent.  See Cornelius v. NAACP Legal Def. Educ. Fund. Inc., 473 U.S. 788, 803 (1985) ("We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." (citation omitted)).  Moreover, "where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum."  Id. at 804.

In Greer v. Spock, the Supreme Court held that while certain areas on a military base were unrestricted and permitted civilian access, the base itself was a nonpublic forum.  424 U.S. at 835-37.  Indeed, the Supreme Court made that decision despite the existence of sidewalks and streets, which are traditional public fora, within the base.  Id.  Moreover, in Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 651 (1981), the Supreme Court distinguished between the characteristics of a public street and a state fairground.  The Heffron Court explained that a public street, which is a traditional public forum, is "continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens,

31

but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." Id. To the contrary, the state fairground, the Court explained, is "a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions." Id.

Building on Heffron's distinction, the Supreme Court in Kokinda determined that a sidewalk adjoining a post office was a nonpublic forum because it "does not have the characteristics of public sidewalks traditionally open to expressive activity." 497 U.S. at 727. The Kokinda Court explained that the post office sidewalk was not a "thoroughfare," and, contrary to the public streets described in Heffron, "was constructed solely to provide for the passage of individuals engaged in postal business." Id. The Kokinda Court also distinguished the post office sidewalk from "the quintessential public sidewalk" because "[t]he postal sidewalk was constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city." Id. at 727-28 (citing Frisby v. Schultz, 487 U.S. 474 (1988)). The Kokinda Court reaffirmed the principle that courts do "not merely identify the area of land covered by the regulation as a sidewalk open to the public and therefore conclude that it was a public forum," but instead must

analyze the "location and purpose" of that forum before categorizing it. Id. at 728-29.

Plaintiff insists that "parking lots are generally considered public fora." Dkt. No. 102 at 6. However, none of the cases upon which Plaintiff relies support the proposition that all parking lots, alone, are public fora. For example, in Naturalist Society, Inc., v. Fillyaw, 958 F.2d 1515, 1522 (11th Cir. 1992), the Eleventh Circuit held that a state park containing a beach is a public forum because, in addition to the beach, the park contained "parking lots, a nature center, and walkways." In reversing the district court's finding that the park was nonpublic, the court held "none of the facts the district court found adequately distinguish [the beach state park] from a typical city park for First Amendment purposes." Id. at 1523; see also id. at 1522 ("In declaring the park a non-public forum *based solely upon its beach characteristics*, the district court ignored other areas of the park which are not beach." (emphasis added)). The Fillyaw court did not hold, as Plaintiff suggests, that *parking lots*, by themselves, are always traditional public fora. Plaintiff's argument, if true, would mean that all parking lots adjoining nonpublic fora are nevertheless public fora. The Supreme Court has already debunked such a contention regarding sidewalks, Kokinda, 497 U.S. at 727, and therefore, Plaintiff's argument is not persuasive.

33

So too, Plaintiff's reliance on United States v. Frandsen, 212 F.3d 1231, 1238 (11th Cir. 2000), is misplaced because the public forum at issue there is a national park, not a parking lot. See id. at 1237 n.4 (noting the Fillyaw decision "confirms that national parks are public fora" and comparing the national park to the state park in that both "are open to the general public").

The same rings true for Plaintiff's reliance on Connor v. Palm Beach County, Florida, No. 95-8628-CIV-HURLEY, 1996 WL 438779, at *9 (S.D. Fla. May 29, 1996), Dkt. No. 102 at 7.  In Connor, the district court determined a county policy was unconstitutional because it barred access to a *park* for free speech activities, specifically.  Id.  The Connor court did not find that the parking lot, alone, was a traditional public forum but instead explained that "[t]he practical effect and intent of [d]efendant's [p]olicy regarding its parks is the eradication of [p]laintiff's ability to organize and engage in activities in a public forum which the [d]efendant considers political advocacy activity and/or advertising for a political campaign."  Id.

Plaintiff has not shown how the Polling Place parking lot is a traditional public forum, such that the Criminal Trespass Warning requires strict scrutiny.  Concluding that all parking lots are public fora, as Plaintiff suggests, cuts against the Kokinda Court's admonishment that courts do "not merely identify the area of land covered by the regulation as a sidewalk open to the public

34

and therefore conclude that it was a public forum." Kokinda, 497 U.S. at 728.   Furthermore, Plaintiff neither points to any characteristic of the parking lot distinguishing it from the Polling Place, nor anything indicating it bears the features of a traditional or designated public forum.   Nor is there a genuine issue of material fact as to whether Coffee County did anything to designate the parking lot as a public forum.

What's more, O.C.G.A. § 21-2-414 establishes a "buffer zone" within 150 feet of the exterior of any polling site, and a "supplemental" buffer zone that extends to the twenty-five feet around any voters standing in line to enter a polling place. Accordingly, under Georgia law, "[n]o person shall solicit votes in any manner or by any means or method, nor shall any person distribute or display any campaign material, nor shall any person solicit signatures for any petition, nor shall any person, other than election officials discharging their duties, establish or set up any tables or booths on any day in which ballots are being cast," within a polling place or within either of the buffer-zones at 150 from a polling place, or twenty-five feet from a voter. Id.   So, of all parking lots, this one is perhaps the most unlikely to be a traditional or designated public forum because Georgia law already places restrictions on it.   Even if Plaintiff could point to any evidence of prior expressive conduct occurring in the Polling Place parking lot, she has made no showing of any

affirmative intent by the County to designate the parking lot as a public forum.  Instead, like the sidewalks adjoining the post office at issue in Kokinda, the Court is left to conclude the obvious—that the Polling Place parking lot where the Criminal Trespass Warning was enforced does not transform the Warning's scope to include a public forum.  Instead, the Polling Place is a nonpublic forum intended to be used for voting-related purposes, and the parking lot facilitates that very purpose.

**2. The Criminal Trespass Warning is viewpoint neutral.**

Because the Criminal Trespass Warning restricts speech in a nonpublic forum, it must be viewpoint neutral and reasonable. Perry, 460 U.S. at 50-54.  "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius, 473 U.S. at 799-800 (citation omitted).

While the text of the Criminal Trespass Warning is not directed at any particular view, Plaintiff insists the Warning discriminates based on viewpoint by targeting Plaintiff because of her "view that everyone (including people who have been historically disenfranchised, who are disabled, who lack government identification, or who need transportation) should vote." Dkt. No. 84 at 16.  Plaintiff insists that because

36

Defendant Martin was yelling and arguing "first, louder, and more persistently" in the voting area, Defendants' "stated justification for banning [Plaintiff] reeks of pretext." Id.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995) (citation omitted). However, *content*-based speech restrictions in *nonpublic* fora are permitted so long as such regulations are designed to preserve the forum for its legitimate purpose. Id. at 829-30; see also Perry, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property."). By contrast, *viewpoint*-based speech restrictions are those that target the "opinion or perspective of the speaker." Reed v. Town of Gilbert, 576 U.S. 155, 168 (2015) (quoting Rosenberger, 515 U.S. at 829); see also Rosenberger, 515 U.S. at 828 (holding that viewpoint discrimination occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction" (citing Perry, 460 U.S. at 46)).

The distinction between impermissible viewpoint discrimination and permissible content-based regulations is "not a precise one." Rosenberger, 515 U.S. at 831. Indeed, "discrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination." Id. at 830-31 (citation omitted). So, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." Id. at 829 (citation omitted). Accordingly, *viewpoint* discrimination is "presumed to be unconstitutional," because it is "an egregious form of content discrimination." Id. at 828-29.

Nothing in the record shows that Defendants were motivated by a desire to suppress Plaintiff's viewpoint. On its face, the Criminal Trespass Warning is both content and viewpoint neutral. See Dkt. No. 69-4. Again, Plaintiff challenges only the Criminal Trespass Warning, not Defendant Martin or the Board's *decision* to remove and ban Plaintiff from the Polling Place. Regardless, Plaintiff has presented no evidence that Defendant Martin or the Board of Elections was motivated by a desire to suppress Plaintiff's *viewpoint* in removing her from the Polling Place, calling the police, and requesting the Criminal Trespass Warning's issuance. No evidence suggests the Warning was anything other than viewpoint neutral, nor does it show that Plaintiff was asked

to leave and issued the Warning because of her "view that everyone (including people who have been historically disenfranchised, who are disabled, who lack government identification, or who need transportation) should vote."  Dkt. No. 84 at 16.

Plaintiff's argument that the deposition of Larry Nesmith, an elections observer, supports a finding of viewpoint discrimination is flawed.  Nesmith's testimony shows that on the day of the incident, Nesmith and Defendant Martin were in an office away from the voting area when Defendant Martin was notified that Plaintiff was "doing stuff that she wasn't supposed to do. She was assisting voters and that kind of thing. You know, so they're like, someone needs to do something. You know, she's doing this wrong and everything."  Dkt. No. 88 at 24:21-24.  Nesmith's testimony does not suggest, as Plaintiff contends, that Defendant Martin moved to the voting area after hearing *only* that Plaintiff was *assisting* voters.  Dkt. No. 84 at 16.  Instead, Nesmith testified that after hearing Plaintiff was "doing something wrong," Defendant Martin "went from zero to a hundred just that fast," dkt. no. 88 at 26:3-7, 24:25-25:1, and "left stormful," id. at 27:17-18.  Nesmith explained that he did not go to the voting area with Defendant Martin.  Id. at 71:22-72:5, 88:13-19.

After Defendant Martin returned, Nesmith testified, she was "very upset" and "agitated," and he said she was "tired of [Plaintiff's] shit," and wanted to "put a stop to this."  Id. at

28:2-5, 29:17-18, 28:6-8.  According to Nesmith, Defendant Martin then called the police.  Id. at 28:10-11.

Nesmith also testified that Ms. Cathy Latham, another elections observer, and not Defendant Martin, was "really the one that started everything. She's the one that made all the, you know, accusations that, you know, [Plaintiff] was doing something," and that "[Defendant Martin] didn't accuse [Plaintiff] [sic] doing it, because [Defendant Martin] knew what she do [sic]. So it wasn't nothing."  Id. at 41:7-12.  While Nesmith testified that he does not remember exactly what Latham reported to Defendant Martin, he did recall that Latham stated Plaintiff "was illegally assisting" voters.  Id. at 69:19-20; see also id. at 25:14-21, 26:15-20, 39:9-12.  Nesmith also explained that it is "okay" for elections observers to report a disagreement or argument in a polling room to an election supervisor, as Latham did here, and as Nesmith himself has done before in other instances.  Id. at 58:16-59:4. Furthermore, Nesmith testified that Defendant Martin has witnessed in the past Plaintiff bringing in other voters to assist them, and that he has never seen Defendant Martin try to prevent Plaintiff from bringing these voters in and assisting them.  Id. at 41:13-24.

Problematic for Plaintiff is that nowhere in Nesmith's testimony does he explain that Defendant Martin's removal of Plaintiff from the voting area or call to the police, which

ultimately resulted in the Criminal Trespass Warning's issuance, was connected to Plaintiff's *viewpoint* that "everyone (including people who have been historically disenfranchised, who are disabled, who lack government identification, or who need transportation) should vote." Dkt. No. 84 at 16.  Nor does Nesmith testify that Defendant Martin treated differently other voters who also allegedly touched ballot scanner machines or yelled in the voting area.   So, despite Plaintiff's insistence otherwise, Nesmith's testimony does nothing to suggest that Plaintiff was banned or asked to leave because of her viewpoint.

Moreover, Plaintiff's own deposition testimony shows she is uncertain as to what motivated Defendant Martin to remove Plaintiff from the Polling Place or request the Warning.  Dkt. No. 72 at 57:20-58:1 ("I wish I knew the answer to that question. We would have to get that from [Defendant Martin], because I definitely didn't do anything wrong. I didn't do anything wrong to be banned for."); see also id. at 58:2-11 (When Plaintiff is asked whether she is accusing Defendant Martin of taking action against her because she is "African-American or support[s] Democratic causes or advocate[s] for African-American constituents," Plaintiff responds "I'm sure some of all of that played a part. That's my position. But then it could have been – it could have been also other people that might have been involved.").   Plaintiff's deposition testimony in this regard amounts to no more than

41

speculation, which is "insufficient to create a genuine issue of material fact." Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

Moreover, Plaintiff cites to no facts or law to support her suggestion that "Martin's stated justification for banning Pearson reeks of pretext," because Defendant Martin "did not ban herself, even though she was yelling and arguing first, louder, and more persistently." Dkt. No. 84 at 16. Even if Plaintiff's argument had merit, without any record evidence of precisely what viewpoint Defendant Martin was discriminating against, and with no evidence of motive, her argument is insufficient to create a fact issue. Plaintiff's arguments amount to speculation, and at most, indicate that the parties are familiar with each other from past dealings.

Consequently, Plaintiff has presented no evidence to support her speculation as to Defendant Martin or the Board's potential motive. There is no evidence in the record, for example, that Defendant Martin and any other poll worker, elections observer, or Board of Elections member discussed Plaintiff's advocacy efforts or history of voter assistance in connection with her removal from the Polling Place and Officer Stewart's subsequent issuance of the Criminal Trespass Warning. In fact, there is record evidence

suggesting the contrary.  See, e.g., Dkt. No. 89 at 33-34
(Deposition of Board of Elections member Matthew McCullough
describing Defendant Martin's phone call asking whether she had
permission to request a trespass warning against Plaintiff and
explaining that he was aware that Plaintiff "had been investigated
for something," but did not know the specifics until his deposition
was taken, is "not aware of a whole lot with [Plaintiff]" and that
he does not recall "any conversations outside of what we've dealt
with for this where people talked about her reputation.").
Moreover, Nesmith's testimony, as well as Plaintiff's own
testimony, show that Defendant Martin addressed Plaintiff only
after she received a report that Plaintiff was "doing something
wrong" in the voting area.[6]  Dkt. No. 88 at 25:6-18; Dkt. No. 72
at 57:20-58:1-11.

The Court concludes no evidence shows the Warning is anything
other than viewpoint neutral.  Therefore, the Court must now

---

[6] Whether Plaintiff actually touched the buttons on the ballot
scanner machine does not shift the analysis of whether Plaintiff's
ban was viewpoint based.  Indeed, while Defendants contend
Defendant Martin heard Plaintiff was touching the buttons, and
Plaintiff disputes ever touching the buttons, there is sufficient
evidence to support a finding of a disruption—the purported reason
Defendant Martin requested the Warning.  Dkt. No. 74 at 30:3-33:1;
70:2-73:11; Dkt. No. 76 at 60:11-23.  In fact, Plaintiff concedes
that she was yelling in the voting area, and that yelling can
constitute a disruption.  Dkt. No. 72 at 45:3-47:15; 51:4-20;
68:19-21; see also Dkt. No. 69-4 (Warning reflecting only that
Plaintiff caused a disruption, not that she touched buttons).

determine whether the Warning was reasonable.  ISKCON, 147 F.3d at 1285.

## 3. The Criminal Trespass Warning, given the context of the case, was not unreasonable.

Viewpoint-neutral speech restrictions in nonpublic fora "need only be *reasonable*, [they] need not be the most reasonable or the only reasonable limitation."  Id. at 1286 (quoting Lee, 505 U.S. at 683).  "[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved."  Heffron, 452 U.S. at 650-51 (citations omitted).  So, the Court must determine whether the Criminal Trespass Warning "is 'reasonable in light of the purpose served by the forum,': voting." Mansky, 138 S. Ct. at 1886 (quoting Cornelius, 473 U.S. at 806). "Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." Id. at 1888 (citing Cornelius, 473 U.S. at 808-09).

The forum at issue in this case is the Polling Place, or any Polling Place or building where Board of Elections business is held—a nonpublic forum which facilitates each citizen's right to vote by secret ballot in a restricted and dedicated space.  See Burson, 504 U.S. at 201-06 (describing history of voter fraud and

intimidation and the various responses by the States, including restricted speech and campaign zones around polling places and the secret ballot).  "Furthermore, because a government has such a compelling interest in securing the right to vote freely and effectively, this Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question."  Id. at 208-09 (alteration in original) (footnote omitted) (quoting Munro v. Socialist Workers Party, 479 U.S. 189, 195 (1986)); see McDonough v. Garcia, No. 19-21986-CIV-MORENO, 2022 WL 971392, at *7-8 (S.D. Fla. Mar. 31, 2022) ("Like the Eleventh Circuit in Jones, the Court cannot second-guess his decision to maintain an orderly meeting in view of a statement that even [p]laintiff admits could be perceived as a threat and is, at the very least, disruptive." (citing Jones v. Heyman, 888 F.2d 1328, 1331-32 (11th Cir. 1989) (holding mayor's removal of a speaker from a commission meeting for being disruptive constituted a reasonable time, place, and manner restriction and did not violate the speaker's First Amendment right))); see also Helms v. Zubaty, 495 F.3d 252, 257-60 (6th Cir. 2007) (holding county official's restriction on speech after arrestee refused to leave her office, a nonpublic forum, was reasonable); Perez v. Hoblock, 368 F.3d 166, 175 (2d Cir. 2004) (finding annual meeting was a

nonpublic forum and board's imposition of fine for disruptive conduct was reasonable and viewpoint neutral).

As noted supra pp. 35-36, in Georgia, specifically, there are many restrictions on activities at polling places. O.C.G.A. § 21-2-414 establishes a "buffer zone" within 150 feet of the exterior of any polling site, and a "supplemental" buffer zone that extends to the twenty-five feet around any voters standing in line to enter the polling place and vote. Moreover, under Georgia law, "[n]o person shall solicit votes in any manner or by any means or method, nor shall any person distribute or display any campaign material, nor shall any person solicit signatures for any petition, nor shall any person, other than election officials discharging their duties, establish or set up any tables or booths on any day in which ballots are being cast," within a polling place or within either of the buffer-zones at 150 from a polling place, or twenty-five feet from a voter. Id. Georgia law also imposes upon election officials, such as Defendant Martin, the duty "to keep order" at the Polling Place. Dkt. No. 100 at 15-16 (citing O.C.G.A. § 21-2-413(h)).[7]

---

[7] O.C.G.A. § 21-2-413(h) states, in pertinent part, "[i]t shall be the duty of the chief manager to secure the observances of this Code section, to keep order in the polling place, and to see that no more persons are admitted within the enclosed space than are permitted by this chapter."

The Criminal Trespass Warning, and Defendants' purported reason for requesting its issuance, was reasonably related to preserving the Polling Place as a place for citizens to execute their vote.  Here, the Polling Place is a government building, used for voting purposes during the early voting period and on election day.  Dkt. No. 100 at 4; Dkt. No. 102 at 7l Dkt. No. 69-4.  Plaintiff concedes that "yelling inside a polling place could, depending on any number of factors, be disruptive," and concedes that she did raise her voice in the voting area.  Dkt. No. 84 at 8 (citing Dkt. No. 72 at 68:19-21, 46:21-47:51).  Moreover, several witnesses testified that Plaintiff's behavior in the voting area was disruptive such that she should have been removed from the Polling Place.  See e.g., Dkt. No. 74 at 30:3-33:1, 70:2-73:11 (Ernestine Clark's deposition testimony describing the incident and stating that Plaintiff, Defendant Martin, and poll worker JoAnne Andrews were all "being loud," and "going back and to talking loud, and it was loud enough that the others voters – it got the other voters' attention," and "the action and the commotion was disturbing the other voters"); Dkt. No. 72 at 45:3-47:21, 51:4-20 (Plaintiff's deposition testimony explaining that both she and Defendant Martin yelled during the incident); Dkt. No. 76 at 60:11-23 (Officer Stewart's deposition testimony explaining that, of the nine witnesses he interviewed, no witness contradicted Clark or Defendant Martin's account of what occurred).

Importantly, the Warning does not infringe on Plaintiff's right to vote.  Indeed, it specifically allows her the right to appear in order to vote.  Dkt. No. 69-4.  So, the Warning is not, as Plaintiff suggests, a total ban.  Even assuming the Warning applies indefinitely "during any election," as opposed to only the 2020 election cycle, the Warning is not unreasonable to prevent further disruption at the Polling Place.  Dkt. No. 84 at 21.[8]  In a nonpublic forum, "there is no requirement of narrow tailoring" just a requirement that the government "be able to articulate some sensible basis" for excluding Plaintiff.  Mansky, 138 S. Ct. at 1888; see also Adderley, 385 U.S. at 48 n.7 ("'The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express

---

[8] The Parties dispute whether the Warning bars Plaintiff for a limited time or indefinitely.  Dkt. No. 84 at 21; Dkt. No. 69-15 at 2.  An audio recording transcript of a conversation between Defendant Martin, Officer Stewart and police chief Edminstin reflects that Defendant Martin asked Edminstin, "[w]ill this suffice for the Douglas precinct as well on election day?" dkt. no. 100-2 at 41:20-22, to which Edminstin responded, that because the Douglas precinct is a "city building" "being used for elections," the Douglas precinct is covered by the Warning, id. at 41:7-17.  The transcript does not reflect Defendant Martin's desire to ban Plaintiff forever, as Plaintiff contends.  Instead, it shows that Defendant Martin asked a clarifying question regarding a potential warning's scope.  Even taking the facts in the light most favorable to Plaintiff, the audio recording transcript simply reflects Defendant Martin's desire for the Warning to include the Douglas precinct.  Notably, Defendant Martin's written statement provided to police the day of the incident reflects Defendant Martin requested that Plaintiff "be banned from the location and any polling place for 2020."  Dkt. No. 69-15 at 2.

may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.' 'The conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association. The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited.'") (quoting Cox v. Louisiana, 379 U.S. 536, 554-55, 563 (1965)).

Also with regard to reasonableness of the Warning, the Court concludes that even including the parking lot, fifty feet beyond the door of the Polling Place, does not foreclose Plaintiff's ability to exercise, via alternate channels, her pro-voting rights advocacy under the First Amendment.  For example, Plaintiff can still lawfully drop off and pick up voters in any area near the Polling Place, such as a neighboring building, neighboring parking lot, or sidewalk.  Indeed, "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the

speaker's message." Cornelius, 473 U.S. at 809 (citing Greenburgh
Civic Ass'n, 453 U.S. at 129).

> Although the avoidance of controversy is not a valid
> ground for restricting speech in a public forum, a
> nonpublic forum by definition is not dedicated to
> general debate or the free exchange of ideas. The First
> Amendment does not forbid a viewpoint-neutral exclusion
> of speakers who would disrupt a nonpublic forum and
> hinder its effectiveness for its intended purpose.

Id. at 811.  To conclude, the Court finds that the Warning is not
narrowly tailored.  However, because of the nature of the forum,
narrow tailoring is not required.  Mansky, 138 S. Ct. at 1888; see
also Adderley, 385 U.S. at 48 n.7.  Therefore, the Court concludes
that the Defendants have articulated "some reasonable basis" for
the issuance of the Warning, and therefore, Plaintiff's First
Amendment rights were not violated.

Accordingly, Plaintiff's First Amendment claims based on
viewpoint and content restrictions fail, and Defendants are
entitled to summary judgment on these claims.

**B. Unbridled Discretion & Prior Restraint**

Plaintiff also challenges the constitutionality of the
Criminal Trespass Warning as a prior restraint entered with
Defendants' "unbridled discretion."  Dkt. No. 84 at 19, 23.
Plaintiff argues there is no written policy designating what level
of disruption warrants removal of a person from the Polling Place.
Her argument fails.

**1. Prior Restraint**

A prior restraint exists "when the government can deny access to a forum for expression before the expression occurs." United States v. Frandsen, 212 F.3d 1231, 1236–37 (11th Cir. 2000) (citation omitted).  "Every imposition of a prior restraint is unconstitutional if the scheme either (1) places unbridled discretion in a government official or agency or (2) fails to impose a time limitation on a government's issuing a license." Catron v. City of St. Petersburg, No. 809-CV-923-T-23EAJ, 2009 WL 3837789, at *10–11 (M.D. Fla. Nov. 17, 2009) (finding an ordinance preventing unlawful activity after the issuance of a trespass warning was not a prior restraint on speech).

The Criminal Trespass Warning is not a prior restraint because it does not require an application for or prior approval of Plaintiff's speech.  Instead, the Warning was issued after Plaintiff's disruption occurred.  Dkt. No. 69-4.  So, the Warning appears to be a subsequent punishment, "which regulate[s] a given type of speech by penalizing the speech only *after* it occurs." Barrett v. Walker Cnty. Sch. Dist., 872 F.3d 1209, 1223 (11th Cir. 2017) (citations omitted); see also Otto v. City of Boca Raton, 353 F. Supp. 3d 1237, 1271 (S.D. Fla. 2019) (holding ordinances did not constitute prior restraints because they penalized speech after it occurred rather than establishing a permitting scheme allowing the government to prevent speech prior to its occurrence), rev'd on other grounds, 981 F.3d 854.

Unlike a licensing scheme that prohibits speech unless a plaintiff receives a permit or prior consent, the Criminal Trespass Warning penalizes Plaintiff's "subsequent refusal" to leave the Polling Place after she caused a disruption therein and, as a result, violated Georgia's trespass law. Sheets v. City of Punta Gorda, 415 F. Supp. 3d 1115, 1126 (M.D. Fla. 2019) ("The Ordinance does not penalize unconsented recording. Instead, it penalizes the subsequent refusals to stop recording without consent or leave City Hall because they disrupt the purpose of the forum."); see also Dkt. No. 69-4 (Criminal Trespass Warning citing O.C.G.A. § 16-7-21).

## 2. Unbridled Discretion

Likewise, Plaintiff's unbridled discretion argument necessarily fails. "Perhaps the plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to grant permits but that provides no standards by which the official's decision must be guided." Barrett, 872 F.3d at 1221 (citation omitted). "Although this doctrine originated with cases involving grants of power to executive officials to determine whether or not to grant licenses to engage in expression at all it has subsequently been held to apply to a wider range of burdens on expression." Bourgeois v. Peters, 387 F.3d 1303, 1317 (11th Cir. 2004) (citing Lovell v. Griffin, 303 U.S. 444 (1938) (invalidating an ordinance requiring

52

individuals to obtain permits before circulating leaflets)); see also id. (collecting cases).

Plaintiff relies on Bourgeois for the broad proposition that the unbridled discretion doctrine can apply to any alleged impingement on speech.  Dkt. No. 84 at 17.  However, Bourgeois itself and the cases the court cites for this broader application are all limited to ordinances or policies which impose some additional restriction on speech either before it occurs and which are enforced by a governmental official with "uncabined judgment." See, e.g., Bourgeois, 387 F.3d at 1316, 1317 (holding the city's policy of magnetometer searches of protesters on their way into a protest was a prior restraint and the decision to implement the policy was the exercise of unbridled discretion (first citing Sec. of State of Md. v. Joseph H. Munson, Co., 467 U.S. 947, 946 n.12 (1984) (explaining that a statute imposing a twenty-five percent limit on charitable fundraising expenses while permitting the secretary of state to grant a waiver "whenever necessary" where organizations fail to meet that limitation "place[d] discretion in the hands of an official to grant or deny a license"), then citing Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 757 (1988) (finding an ordinance that permitted the distribution of newspapers, but gave the mayor complete discretion over whether newsstands could be used to aid the process, was an

unconstitutional prior restraint and placed unbridled discretion in the hands of the mayor))).

The Criminal Trespass Warning is not a licensing or permitting scheme granting Defendant Martin or the Board discretion to allow or disallow speech generally.  To the contrary, it codifies a specific restriction applicable only to Plaintiff after her disruption at the Polling Place.  Moreover, to the extent the Criminal Trespass Warning was used as the basis for Plaintiff's arrest, it did so by effectuating Georgia's trespass statute, O.C.G.A. § 16-7-21. Dkt. No. 69-4 (Criminal Trespass Warning citing O.C.G.A. § 16-7-21).  Plaintiff cites no cases where the unbridled discretion doctrine applies in this context.[9]

Accordingly, Plaintiff's prior restraint and unbridled discretion claims fail, and Defendants are entitled to summary judgment on these claims.

### C. Vagueness Challenge

---

[9] To the extent Plaintiff characterizes her unbridled discretion claim as an as-applied claim against Defendants Martin and the Board of Elections, that claim necessarily fails.  See Lacroix v. Lee Cnty., No. 2:18-CV-143-FTM-38CM, 2018 WL 3536173, at *4 (M.D. Fla. July 23, 2018) ("Plainly, though, unbridled discretion claims attack on the text of the policy rather than its individual enforcement." (citing Granite State Outdoor Advert., Inc. v. Cobb Cnty., 193 F. App'x 900, 905 (11th Cir. 2006) ("The Supreme Court has 'long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially....'"), aff'd, 819 F. App'x 839 (11th Cir. 2020)).

Plaintiff also challenges the Criminal Trespass Warning as unconstitutionally vague.  Dkt. No. 53 ¶ 41.

As an initial matter, the Parties seemingly conflate Plaintiff's vagueness claim with her overbreadth, prior restraint, and unbridled discretion claims.  See Dkt. No. 84 at 23 (Plaintiff arguing there is no standard for determining what constitutes disruptive conduct and when removal of persons or the issuance of a warning is warranted); Dkt. No. 100 at 14-16 (Defendants arguing the Warning is not arbitrary or haphazard, but instead is justified by both Defendant Martin's duty to maintain order in the Polling Place and various sections of the Georgia code adhering to the unlawful touching of buttons at a polling place); Id. at 22-23 (Defendants arguing "[t]he 'unbridled discretion' doctrine has no application to the facts of this case" in response to Plaintiff's assertion that the Warning is unconstitutional "because there was no written policy for determining when a disruption at a polling place should result in someone being removed").

For any statute or regulation to be void for vagueness, it must "fail[] to give the ordinary citizen adequate notice of what is forbidden and what is permitted."  Horton v. City of St. Augustine, 272 F.3d 1318, 1330 (11th Cir. 2001) (quoting City of Chicago v. Morales, 527 U.S. 41, 60 (1999)).  A regulation is not vague when it "uses ordinary terms that have common usage and understanding."  Id.  "A vaguely worded statute can trap innocent

parties by failing to give notice of what is prohibited, and allow enforcement officials to defer to their own standards of what constitutes a violation." DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1270-71 (11th Cir. 2007) (citing Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)). "Ordinarily, a court must evaluate a vagueness challenge by the facts of the particular case before it." Id. at 1271 (citing Konikov v. Orange Cnty., 410 F.3d 1317, 1330 (11th Cir. 2005)). "When an ordinance restricts or penalizes speech, however, it can also exert a chilling effect that discourages individuals who are not present before the Court from exercising their First Amendment rights for fear of arbitrary enforcement." Id. (citing Grayned, 408 U.S. at 109). "Accordingly, in such cases, courts may consider evidence of discriminatory or arbitrary enforcement that would be likely to chill expression by others." Id. (citing Konikov, 410 F.3d at 1330).

Plaintiff fails to cite any case to support her argument that the void-for-vagueness doctrine applies to the Criminal Trespass Warning, or even to Defendants' decision to request the Warning, and the Court is aware of none. See e.g., Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1310 (11th Cir. 2009) ("The void-for-vagueness doctrine reflects the principle that 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess

at its meaning and differ as to its application, violates the first essential of due process of law.'" (emphasis added) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 629 (1984))); United States v. Aggison, No. CR 1:22-MJ-718-RDC, 2023 WL 2250313, at *2 (N.D. Ga. Feb. 27, 2023) ("Pursuant to the Due Process Clause of the Fifth Amendment, a statute or regulation is 'void for vagueness if its prohibitions are not clearly defined.'" (citations omitted)); id. at *3–5 (applying the doctrine to a criminal statute); Dream Defs. v. Gov. of the State of Fla., 57 F.4th 879, 890 (11th Cir. 2023) (vagueness challenge of Florida statute criminalizing "riots" and "violent public disturbance[s]"); Chapotin v. United States, No. 21-10586, 2022 WL 2866670, at *4 (11th Cir. July 21, 2022), cert. denied, 143 S. Ct. 468 (2022) (explaining Eleventh Circuit precedent which held the Federal Sentencing Guidelines "cannot be unconstitutionally vague because they do not establish the illegality of any conduct and are designed to assist and limit the discretion of the sentencing judge" (quoting In re Griffin, 823 F.3d 1350, 1354 (11th Cir. 2016))).  Even if the void-for-vagueness doctrine does apply here, the Warning is not void for vagueness.

To prove the Criminal Trespass Warning is vague, Plaintiff "must either show that the ordinance fails to give fair warning of what constitutes a wrongdoing or that the statute lacks objective enforcement standards." DA Mortg., Inc., 486 F.3d at 1271. "The

traditional test for whether a statute or regulation is void on its face is if it is so vague that 'persons of common intelligence must necessarily guess at its meaning and differ as to its application.'"   Id. (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).

The Criminal Trespass Warning is not vague.[10]  First, the Warning does not fail to provide notice of what conduct is prohibited.  For example, in Greyned v. City of Rockford, 408 U.S. 104 (1972), the Supreme Court upheld a noise ordinance prohibiting "any noise or diversion which disturbs or tends to disturb the peace or good order of [a] school session or class thereof," but explained:

> Condemned to the use of words, we can never expect mathematical certainty from our language. The words of the . . . ordinance are marked by "flexibility and reasonable breadth, rather than meticulous specificity," but we think it is clear what the ordinance as a whole prohibits.

Greyned, 408 U.S. at 108-110 (footnote omitted) (citation omitted).

---

[10]  Importantly, as noted supra, pp. 24 n.3, in her amended complaint, Plaintiff does not challenge as vague Defendant Martin and the Board of Elections's decision to ask Plaintiff to leave or to ban Plaintiff from the Polling Place; instead, Plaintiff alleges only the Criminal Trespass Warning itself is void for vagueness. Dkt. No. 53 ¶ 41.  Plaintiff's arguments in her briefing, however, also target the decision to remove and ban Plaintiff as void for vagueness. Dkt. No. 84 at 11-12.  Even if the Court considers her arguments, Plaintiff has not shown how the vagueness doctrine applies to the decision to request the Warning.

Clearly, the Criminal Trespass Warning applies to the Polling Place, all other Coffee County polling locations, and any building "lawfully used" by the Board of Elections "during the time of voting or any other Board of Elections business."   Dkt. No. 69-4. The Warning is directed only to Plaintiff, and it allows Plaintiff to be at Coffee County polling places or other Board of Elections buildings to vote.   Id.; Dkt. No. 72 at 119:14-22.   The text of the Warning shows that Plaintiff "was advised that if [she] returned onto said property that [she] would be in violation of applicable provisions of Georgia law, O.C.G.A. § 16-7-21, prohibiting trespass, and be subject to arrest."   Dkt. No. 69-4.

A portion of the Warning labeled "additional comments," states:

> On 10/27/2020 at 1132 hours I, Sergeant Joe Stewart, was summoned to 224 West Ashley Street and asked to ban [Plaintiff] from the premises. This also extends to any polling place that is controlled by the Coffee County Board of Elections during the time of voting or any other Board of Elections business. This will include property not at 224 West Ashley Street but being lawfully used by the [B]oard[.] [Plaintiff] is being banned for disruptive behavior. She may only come to a polling place in order to vote and she has already cast her ballot for this year's election. She was told that she was banned by election supervisor [Defendant] Martin.

Id.; Dkt. No. 72 at 117:14-118:15.

After Officer Stewart explained the Warning's contents, Plaintiff asked him what it was based on, to which Officer Stewart explained that his findings would be available to Plaintiff through

a police report of which she could request a copy. Dkt. No. 78, Ex. E, at 0:15:00-0:15:31.

Plaintiff has not shown that the Criminal Trespass Warning "is . . . so vague that persons of ordinary intelligence would have to guess at its meaning." DA Mortg., Inc., 486 F.3d at 1271. Instead, the Warning exhibits an objective enforcement standard—Plaintiff's presence on the property. Id.; Dkt. No. 69-4. The Warning clearly states that Plaintiff was banned from the Polling Place and other Board of Elections property "during the time of voting or any other Board of Elections business" or she would be in violation of Georgia's trespass code, and would, accordingly, be subject to arrest. Dkt. No. 69-4. Any person would know that failing to obey the Warning could result in arrest. Nor does the Warning carry an inherent risk of arbitrary enforcement. Any officer would know that Plaintiff's continued presence at the Polling Place or any property identified by the Warning, for any reason other than to vote, signals Plaintiff's violation of Georgia's trespass statute.

Accordingly, Plaintiff fails to show the Criminal Trespass Warning is void for vagueness, and Defendants are entitled to summary judgment on this claim.

### D. Overbreadth

Next, Plaintiff argues the Criminal Trespass Warning is overbroad, in violation of the First Amendment. Dkt. No. 84 at

14; Dkt. No. 102 at 8-9.  Under the overbreadth doctrine, a plaintiff may "assert a facial challenge to a statute because it could compromise the First Amendment rights of parties not before the Court." DA Mortg., Inc., 486 F.3d at 1269 (citations omitted). So, "the litigant challenges the statute on facts that apply to others." Id. (citing CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1271 (11th Cir. 2006)).  "The Court reserves [the overbreadth doctrine] for cases involving restrictions on the right to free speech." Id. (citing Horton, 272 F.3d at 1331).  "The rationale behind the [overbreadth doctrine] is that 'the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court.'" Id. (quoting Horton, 272 F.3d at 1331).

"Accordingly, the Supreme Court has permitted facial challenges based on overbreadth where an ordinance delegates overly broad discretion to enforcement officers, creating an 'impermissible risk of suppression of ideas' in every application and where an ordinance 'penalizes a substantial amount of speech that is protected.'" Id. (quoting Forsyth Cnty. v. Nationalist Movement, 505 U.S. 23, 129-30 (1992)).  Generally, though, the Supreme Court and the Eleventh Circuit have only applied the overbreadth doctrine "in cases where the ordinance makes access to a forum for speech contingent upon issuance of a license or permit." Id. (citations omitted)

61

Plaintiff does not allege that her access to the Polling Place was contingent on any license or permit.  As explained supra, pp. 50-54, the Criminal Trespass Warning is not a prior restraint on speech.  The Warning "does not establish a permitting or licensing regime" making speech at the Polling Place, or any other location within its confines, contingent on receipt of a permit from the County.  DA Mortg., Inc., 486 F.3d at 1269.  Indeed, the Warning is a subsequent reprimand for Plaintiff's conduct after her disturbance at the Polling Place.  Moreover, the Criminal Trespass Warning applies only to Plaintiff and puts her on notice, as the Georgia trespass statute requires, that if she were to return to or stay on the property, she will be in violation of the Georgia trespass statute.  See Dkt. No. 69-4; O.C.G.A. § 16-7-21.  So, because the Warning applies only to Plaintiff, there is zero risk that the Warning could lead other people to censor their own speech.  DA Mortg., Inc., 486 F.3d at 1270 (citing Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 799 (1984) (noting that "[i]n order to decide whether the overbreadth exception is applicable in a particular case, we have weighed the likelihood that the statute's very existence will inhibit free expression")).  Thus, the overbreadth doctrine does not apply in this case, and Defendants are entitled to summary judgment on this claim.

**E. Qualified Immunity**

62

Accordingly, because the Court finds the Warning is not unconstitutional under the First Amendment, the Court need not address Defendants' qualified immunity argument.

### III. First Amendment Retaliation Claims

Plaintiff alleges Defendants retaliated against her for her "successful defense of baseless past prosecutions for similar voter assistance and to deter Plaintiff's assistance of persons of color in particular" in violation of her First Amendment right to assist voters.[11]   Dkt. No. 53 ¶¶ 49-50.   Defendants contend they are entitled to summary judgment on Plaintiff's First Amendment

---

[11] In her amended complaint, Plaintiff alleges Defendant Martin "acted with malice and in retaliation for Plaintiff's successful defense of baseless past prosecution for similar voter assistance and to deter Plaintiff's assistance of persons of color in particular," that the Criminal Trespass Warning was "issued with the purpose of preventing Plaintiff from participating in the democratic process by assisting needy voters in their attempt to vote in Coffee County during the 2020 election and beyond," that "Martin sought to silence Plaintiff because of her viewpoint, voter advocacy and because of the racial identifies and viewpoints of the people she seeks to help vote," and finally, that "Defendant Coffee County sought to retaliate against Plaintiff for her viewpoint and for her persistent advocacy surrounding voting and other issues." Dkt. No. 53 ¶¶ 49-52. Plaintiff also alleges that she would not have been banned "but for her prior protected speech and actions and her outspoken support for and actions in furtherance of getting out the African American vote in Coffee County." Id. ¶ 53. The Court notes that when arguing *viewpoint neutrality*, Plaintiff argues only that Defendant Martin's motive was to prevent Plaintiff from assisting voters. Dkt. No. 84 at 16-18. In contrast, regarding Plaintiff's *retaliation* claim, Plaintiff alleges Defendants' motive was Plaintiff's prior prosecution, as well as her voter assistance efforts and, particularly, her assistance "of persons of color." Dkt. No. 53 ¶¶ 49-52.

retaliation claim because there is no record evidence showing a
causal relationship between Plaintiff's protected conduct in
assisting voters and her subsequent ban and arrest. Dkt. No. 69-
2 at 31-33.

"[A]s a general matter the First Amendment prohibits
government officials from subjecting an individual to retaliatory
actions" for engaging in conduct protected by the First Amendment.
Hartman v. Moore, 547 U.S. 250, 256 (2006) (citation omitted).
Accordingly,

> To establish a First Amendment retaliation claim, a
> plaintiff must show that (1) her speech was
> constitutionally protected; (2) she suffered adverse
> conduct that would likely deter a person of ordinary
> firmness from engaging in such speech; and (3) there was
> a causal relationship between the adverse conduct and
> the protected speech.

Brannon v. Finkelstein, 754 F.3d 1269, 1274 (11th Cir. 2014)
(quoting Castle v. Appalachian Tech. Coll., 631 F.3d 1194, 1197
(11th Cir. 2011)). "In § 1983 First Amendment retaliation cases,
the Supreme Court has recognized that retaliatory animus by a
governmental actor is a subjective condition that is 'easy to
allege and hard to disprove.'" DeMartini v. Town of Gulf Stream,
942 F.3d 1277, 1289 (11th Cir. 2019) (first citing Nieves v.
Bartlett, 139 S. Ct. 1715, 1725 (2019) (internal quotation marks
omitted) (quoting Crawford-El v. Britton, 523 U.S. 574, 585
(1998)); and then citing Hartman, 547 U.S. at 257); see also
Hartman, 547 U.S. at 257 (defendant inspectors arguing that "a

plaintiff can afflict a public officer with disruption and expense by alleging nothing more, in practical terms, than action with a retaliatory animus, a subjective condition too easy to claim and too hard to defend against").

As explained supra, pp. 13-22, Plaintiff's transportation of voters is protected conduct.  Moreover, Plaintiff's other voter assistance efforts also constitute protected conduct under the First Amendment.  League of Women Voters of Fla. v. Cobb, 447 F. Supp. 2d 1314, 1331-34 (S.D. Fla. 2006).  So, the Court must determine, taking the evidence in the light most favorable to Plaintiff, whether a jury could conclude that she "suffered adverse conduct and that there was a causal relationship between the adverse conduct" and her protected speech.  Brannon, 754 F.3d at 1274-75.  The Parties do not dispute that banning Plaintiff from the Polling Place amounts to adverse conduct.  Instead, Defendants contest the causal relationship element.  Dkt. No. 69-2 at 31-33 (only arguing Plaintiff fails to "establish a causal connection between [D]efendants['] retaliatory conduct and the adverse effect on her speech").

In this context, the causation inquiry asks whether Defendant Martin, in requesting Plaintiff be banned from the Polling Place and other locations specified in the Warning, was subjectively motivated to ban Plaintiff because of Plaintiff's "successful defense of baseless past prosecutions for similar voter assistance

and to deter Plaintiff's assistance of persons of color in particular"; because Plaintiff engaged in constitutionally protected speech by transporting voters to the Polling Place and otherwise assisting voters; because of Plaintiff's "viewpoint, voter advocacy and . . . the racial identities and viewpoints of the people she seeks to help vote"; or for all of these reasons. Dkt. No. 53 ¶¶ 49-53; see also Brannon, 754 F.3d at 1275.

The Supreme Court clarified the subjective-motivation element in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 285-87 (1977). Mt. Healthy established that,

> [O]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on [his motion for judgment as a matter of law or prior to trial on] summary judgment.

Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 399 (6th Cir. 1999) (citing Mt. Healthy, 429 U.S. at 287)).

Consequently, that "state officials can act lawfully even when motivated by a dislike or hostility to certain protected behavior by a citizen is well established." Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996) (citing Mt. Healthy, 429 U.S. at 97). In this context, state officials are entitled to qualified immunity so long as "the record shows they would have acted as

they, in fact, did act even if they had lacked discriminatory intent." Id. (citing Mt. Healthy, 429 U.S. at 286-87).[12] So, "[w]here the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." Id. at 1535.

No evidence in the record shows that Plaintiff was banned because Defendant Martin or the Board of Elections disliked Plaintiff's "successful defense of baseless past prosecutions for similar voter assistance," her transportation and assistance of voters, or her "viewpoint, voter advocacy and . . . the racial identities and viewpoints of the people she seeks to help vote." Dkt. No. 53 ¶¶ 49-53.

Instead, the evidence, taken in the light most favorable to Plaintiff, shows Defendant Martin participated either as a "prosecutor" or was at least called as the state's witness in Plaintiff's first trial dealing with alleged elections-related

---

[12] "Where discriminatory intent is an element of the tort and the summary judgment record seems to show that discriminatory intent might have played a part in the state official's acts, the existence of the Mt. Healthy doctrine complicates and, therefore, can cloud the question of whether the official acted lawfully or unlawfully in the circumstances. This cloud, in turn, raises the possibility that even conduct which might ultimately be found to be unlawful was objectively reasonable when it was done." Foy, 94 F.3d at 1534.

irregularities which resulted in a mistrial, and did not testify in the second trial.  Dkt. No. 84-5 at 8-10; Dkt. No. 75 at 46:13-48:13.  Indeed, Plaintiff's deposition testimony reflects nothing more than Plaintiff's belief that Defendant Martin "was upset that the [first] prosecution did not go in the favor [Defendant Martin] wanted it to go," and with Plaintiff's clarification, "[s]o don't just take it that I'm saying that's the total reason. That's part of it, I think."  Dkt. No. 72 at 79:2-13.  This amounts to nothing more than speculation, and is accordingly, insufficient to create a genuine issue of material fact.  <u>Valderrama</u>, 780 F.3d at 1112.  Moreover, Defendant Martin testified that she does not recall how she felt after Plaintiff's mistrial, and when asked if Defendant Martin was "aware of what happened when the [second] case went to trial," she responded, "I think [Plaintiff] won. I don't know" and stated she does not remember if or when she learned of Plaintiff's acquittal or certain charges being dismissed.  Dkt. No. 75 at 48:14-50:20.

So, too, elections observer Nesmith's testimony fails to show Defendant Martin was motivated to ban Plaintiff for any of the reasons Plaintiff purports.  First, neither of Plaintiff's prior prosecutions are mentioned in Nesmith's testimony at all.  <u>See generally</u> Dkt. No. 88.  Second, as described <u>supra</u>, pp. 39-41, nowhere in Nesmith's testimony does he explain that Defendant Martin's removing Plaintiff from the voting area, calling the

police, and requesting the Criminal Trespass Warning were connected to Plaintiff's voter transportation and assistance efforts, "assistance of persons of color in particular," or Plaintiff's "viewpoint, voter advocacy efforts, or the racial identities and viewpoints of the people she seeks to help vote." Dkt. No. 53 ¶¶ 49-53.

Plaintiff contends Defendant "Martin's own words and actions on the day of the incident further show a retaliatory motive," but then points to Larry Nesmith's testimony regarding elections observer *Cathy Latham*'s statements and her "violent animosity toward Black people" as opposed to any statements made by Defendant Martin or any Board of Elections official.  Dkt. No. 84 at 31-32.  Plaintiff's assertion that Cathy Latham's involvement in the incident shows a retaliatory motive on Defendant Martin's part misses the mark, for, Latham is neither Defendant Martin, nor a member of the Board of Elections.  Regardless, Nesmith's testimony does not suggest, as Plaintiff advocates, that Defendant Martin "went to the voting area only once she learned [from Latham that Plaintiff] had arrived to assist a voter." Id. at 16-17 (emphasis removed).  Instead, Nesmith testified that after hearing Plaintiff was "doing something wrong," Defendant Martin "went from zero to a hundred just that fast," dkt. no. 88 at 25:15-18, 24:25-25:1, and "left stormful," id. at 27:17-18.

Additionally, Plaintiff's own deposition testimony shows she is uncertain as to what motivated Defendant Martin to remove her, call the police or request the Warning.  Dkt. No. 72 at 57:20-58:1 ("I wish I knew the answer to that question. We would have to get that from [Defendant Martin], because I definitely didn't do anything wrong. I didn't do anything wrong to be banned for."); see also id. at 58:2-11 (When Plaintiff is asked whether she is accusing Defendant Martin of taking action against her because she is "African-American or support[s] Democratic causes or advocate[s] for African-American constituents," Plaintiff responds "I'm sure some of all of that played a part. That's my position. But then it could have been – it could have been also other people that might have been involved.").  Plaintiff's deposition testimony in this regard amounts to no more than speculation, which is "insufficient to create a genuine issue of material fact." Valderrama, 780 F.3d at 1112 (citing Cordoba, 419 F.3d at 1181 ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

Finally, there is no record evidence suggesting any of the Board of Elections members had any unlawful motivation to ban Plaintiff from the Polling Place.  For example, Plaintiff's own deposition testimony shows that she does not know what motivation Board of Elections member Matthew McCullough would have to ban

her.   Dkt. No. 72 at 185:17-188:5 (Plaintiff testifying, in part,
"[i]f I had to just give an answer, I would say he probably didn't
have anything against me, but he was going on what he was told,
because he stated in his deposition when he met me that I was nice.
So had he had the true facts, I don't think he would have voted
for me to be banned, but I don't think he had the true facts . . .
Mr. McCullough just fell victim to go along with whatever Misty
had probably told him"); see also id. at 221:12-222:5 (when asked
whether she alleges McCullough is included in her allegation that
Board of Elections members were "motivated by an attempt to
intimidate and suppress African-American vote," Plaintiff responds
"I'm not certain, because I didn't know Mr. McCullough. But
whomever the board consisted of that were allowing her to continue
this type of behavior, they are the -- those individuals are
responsible, and that's who I'm referring to in that").
Plaintiff's testimony shows nothing more than her own speculation
that McCullough went "along with whatever" he was told, without
any evidence of what McCullough was told about banning Plaintiff,
by whom, or how that was connected to Plaintiff's prior
prosecutions or general voter advocacy efforts.   This evidence is
clearly insufficient to create a genuine issue of material fact as
to motive.   Id.; Valderrama, 780 F.3d at 1112.

Similarly, when asked what motivation Board of Elections
member Ernestine Clark had to ban Plaintiff, Plaintiff stated,

> I really don't know how to answer that, sir. I don't
> know if she's racist against me, if she might be jealous
> of me. I don't know. I don't know what it is. But I think
> she lied. She lied about me stealing the money. If she
> said that I touched equipment she lied about that. And
> for her to help voting for me to be banned, she had no
> just grounds to ban me . . . She did an appointee of the
> mayor's dad . . . The mayor and I don't get along. So
> for Mr. Powell who appointed her to the board, I don't
> know what their relationship is and what they've
> discussed or whatever of ill intent. I don't know. I
> don't know.

Dkt. No. 72 at 188:6-190:13. Plaintiff's speculation as to Clark's
motivation to ban Plaintiff is likewise insufficient to create an
issue of fact. Valderrama, 780 F.3d at 1112.

Likewise, Plaintiff's deposition testimony similarly fails to
create an issue of fact regarding Board of Elections member Eric
Chaney's motivation to ban her. See Dkt. No. 72 at 26:1-19
(Plaintiff's testimony describing a prior incident between she and
Chaney where "he got upset and hollered at [her]" during
Plaintiff's re-election and that regarding both Chaney and Clark,
"there's been some prior histories there might be the reason why
they were called"); id. at 188:1-3 ("Now, you did ask me about
Chaney and Ernestine, and I do feel that they had something against
me, a vendetta."); id. at 191:19-192:17 (Plaintiff recalling her
re-election vote-counting incident with Chaney and explaining "he
truly has a problem with me because he yelled at me"). Again,
Plaintiff's testimony amounts to nothing more than speculation

regarding each of the Board of Elections members' motivations to ban her.

Accordingly, Plaintiff points to no evidence in the record supporting her insistence that "but for [Defendant] Martin's animosity towards [Plaintiff], [Plaintiff] would not have been banned from all election sites in Coffee County." Dkt. No. 84 at 30-31.

Even if Plaintiff could make this showing, Defendant Martin and the Board of Elections are still entitled to summary judgment because Plaintiff fails to rebut Defendants' showing that they "would have reached the same decision . . . even in the absence of protected conduct." Mt. Healthy, 429 U.S. at 287. Indeed, Plaintiff's behavior at the Polling Place was "disruptive" by all accounts, including her own. See supra pp. 44-50. So, the record shows that Defendant Martin's effort to ban Plaintiff from the Polling Place, and all the locations with the Warning's scope, was motivated at least in part by a lawful reason—to maintain order in the Polling Place. O.C.G.A. § 21-2-413(h); Dkt. No. 84 at 8 (citing Dkt. No. 72 at 68:19-21; 46:21-47:51) (Plaintiff conceding that yelling inside a polling place can be disruptive and that she raised her voice in the voting area).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claims.

### IV.   Fourth Amendment Claims

Plaintiff appears to allege against these Defendants claims
for malicious prosecution and false arrest, in violation of the
Fourth Amendment.   Dkt. No. 53 ¶¶ 43-48 (Count Two, titled
"Unlawful Seizure"); Dkt. No. 84 at 25-26.   Defendants contend
they are entitled to summary judgment on Plaintiff's Fourth
Amendment claims because there is not a sufficient causal chain
between Defendant Martin's request for the Criminal Trespass
Warning and Plaintiff's arrest, and, alternatively, that they are
entitled to qualified immunity because there was at least arguable
probable cause for Plaintiff's arrest.   Dkt. No. 69-2 at 27-30.

"[T]o prove 'a violation of [the] Fourth Amendment right to
be free of unreasonable seizures,'" a "plaintiff must establish
(1) that the legal process justifying his seizure was
constitutionally infirm and (2) that his seizure would not
otherwise be justified without legal process." Williams v.
Aguirre, 965 F.3d 1147, 1165 (11th Cir. 2020) (quoting Paez, 915
F.3d at 1285).   However,

> The analysis of whether seizures pursuant to legal
> process violate the Fourth Amendment is distinct from
> the analysis of seizures without legal process. Although
> the lawfulness of a warrantless arrest turns on whether
> the arresting officer had probable cause, the lawfulness
> of seizures pursuant to legal process turns on the
> validity of the legal process itself.

Id. at 1162 (11th Cir. 2020) (citing Lee v. Ferraro, 284 F.3d 1188,
1195-96 (11th Cir. 2002)).   Plaintiff contends "Martin provided

false statements to law enforcement, which induced them to issue an unlawful banishment order, thereby causing her unlawful arrest." Dkt. No. 84 at 26. Because Plaintiff, at times, blurs the lines between these two distinct constitutional claims, the Court analyzes both in turn.

**A. § 1983 Malicious Prosecution Claims**

To prevail on her malicious prosecution claim, Plaintiff "must establish that the legal process justifying [her] seizure . . . was constitutionally infirm and that [her] seizure would not otherwise be justified without legal process." Williams, 965 F.3d at 1165. In the arrest warrant context, "an officer ordinarily does not violate the Fourth Amendment when he executes a facially valid arrest warrant, regardless of whether the facts known to the officer support probable cause." Id. at 1162 (citations omitted). "Instead, the Supreme Court has instructed courts to examine whether 'the judicial officer issuing such a warrant [was] supplied with sufficient information to support an independent judgment that probable cause exists for the warrant.'" Id. (alteration in original) (quoting Whiteley v. Warden, 401 U.S. 560, 564 (1971)). "Under this standard, 'an otherwise insufficient affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the warrant but not disclosed to the issuing magistrate.'" Id. (alterations in original)(quoting Whiteley, 401 U.S. at 565 n.8).

Much like Plaintiff's other claims regarding the Criminal Trespass Warning, Plaintiff fails to cite any case applying malicious prosecution to criminal trespass warnings. Even if the claim is cognizable, it fails.

Plaintiff can prove her arrest was "constitutionally infirm" if she establishes either that the officer who drafted the Criminal Trespass Warning failed to establish probable cause, or that an official who did not draft the Criminal Trespass Warning "intentionally or recklessly made misstatements or omissions necessary to support" its issuance. Id. at 1165; see also Buckner v. Shetterley, 621 F. Supp. 2d 1300, 1303 (M.D. Ga. 2008) ("The Court finds that Eleventh Circuit precedent establishes, with obvious clarity, that a government official is prohibited from intentionally providing false information to law enforcement without probable cause and thereby directly causing a Fourth Amendment violation."). Neither party has cited authority to support the contention that the Criminal Trespass Warning must be supported by probable cause before a non-officer can request its issuance. Even assuming it must, Plaintiff cites no evidence showing Defendant Martin "intentionally or recklessly made misstatements or omissions necessary to support" the Criminal Trespass Warning's issuance. Williams, 965 F.3d at 1165.

Instead, Plaintiff argues, without any evidence for support, that "a jury in this case could conclude [Defendant] Martin

76

knowingly provided false information to law enforcement that caused [Plaintiff's] unlawful arrest," dkt. no. 102 at 10, and that Plaintiff's arrest "was the foreseeable—and a jury could reasonably conclude, intended—result of [Defendant] Martin's false statements to law enforcement." Dkt. No. 84 at 26 n.26.

So too, Plaintiff's arguments that Defendant Martin lied about feeling threatened and lied about Plaintiff touching buttons on the ballot scanner machine are insufficient to create a genuine issue of fact. Plaintiff insists Defendant Martin lied to Officer Stewart by pointing to Defendant Martin's statement that "[Plaintiff] is not to come back in my office . . . If I have to say I feel threatened." Id. at 21. However, in doing so, Plaintiff omits Defendant Martin's *entire* statement to Officer Stewart which can be heard on bodycam audio. Indeed, the recording shows Defendant Martin stated, "She is not to come back in my office. If I have to say I feel threatened, I don't care, cause I do . . . she was all up in my face." Dkt. No. 84-4 9:55-10:18. This statement is clearly insufficient to show Defendant Martin intentionally made false statements to the officers regarding feeling threatened. To the contrary, when the entire statement is considered, it provides evidence that Defendant Martin subjectively did feel threatened. Moreover, Plaintiff contends Defendant Martin told officers that Plaintiff was touching the buttons on the ballot scanner machine, but later stated that she

did not.   However, Plaintiff concedes that she was not arrested for touching the buttons on the ballot scanner machine, but for violating the Criminal Trespass Warning after causing a disturbance at the Polling Place.   So, this contention is immaterial.

Neither "general attacks upon a defendant's credibility" nor "conclusory allegations and speculation" are sufficient to create a genuine dispute about whether Defendant Martin's complaint to the officers was false.   Williams, 965 F.3d at 1165-66 (alterations accepted).   Instead, Plaintiff must "identify affirmative evidence from which a jury could find that" Defendant Martin lied to the officers to cause the issuance of the Criminal Trespass Warning. Id. (citation omitted).   Because Plaintiff fails to point to any evidence of false statements or omissions by Defendant Martin, she fails to show a genuine dispute of material fact as to her § 1983 malicious prosecution claim.   Therefore, Defendants are entitled to summary judgment on this claim.

**B. § 1983 False Arrest Claims**

Plaintiff's false arrest claim against these Defendants fails because City of Douglas Officers Stewart and Sprinkle—not Defendant Martin—arrested Plaintiff.

In this circuit, "[t]o establish § 1983 liability, a plaintiff must show 'proof of an affirmative causal connection' between a government actor's acts or omissions and the alleged

constitutional violation, which 'may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation.'" <u>Brown v. City of Huntsville</u>, 608 F.3d 724, 737 (11th Cir. 2010) (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986)).   "Merely being present with the arresting officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action." <u>Id.</u>; <u>see also</u> <u>Dawson v. Jackson</u>, No. 2:16-CV-01738-RDP, 2017 WL 3620254, at *6 (N.D. Ala. Aug. 23, 2017) (finding that the plaintiff did not show that the defendant was part of the authorizing chain of command because "[w]hile [the defendant] called [the arresting officer] over and informed him that [p]laintiff was obstructing government operations, [the defendant] himself did not perform the arrest or in any way command [the arresting officer] to arrest Plaintiff"), <u>aff'd</u>, 748 F. App'x 298 (11th Cir. 2018).

The undisputed facts in the record show that City of Douglas Officers Stewart and Sprinkle—not the remaining Defendants— arrested Plaintiff *and* made the ultimate decision to do so.   Dkt. No. 76 at 71:20-25 (Officer Stewart testifying that he and Officer Sprinkle arrested Plaintiff and that the "decision . . . rested entirely with [Officer Stewart]." <u>Id.</u> at 72:1-5; Dkt No. 69-1 ¶ 10 (citing Dkt. No. 72 at 139:11-16, 140:5-7, 141:11-16, 10:7-3, 144:20-24); Dkt. No. 87 ¶ 10 (not disputing that "Plaintiff

admits that she sued the city police officers because she believes
they unlawfully arrested her," that "Plaintiff faults the city
police officers for arresting her," and that "Plaintiff concedes
that Martin did not arrest her").  What's more, the record also
shows that Officer Stewart conducted his own independent
investigation prior to both the issuance of the Criminal Trespass
Warning and Plaintiff's arrest.  Dkt. No. 76 at 26:8-27:20; 56:5-
61:22; 67:5-72:5 (Officer Stewart describing his investigation of
the incident earlier in the day and the subsequent decision to
issue Plaintiff the Criminal Trespass Warning); see also Dkt. No.
69-5 (incident report).

Plaintiff's insistence that the Eleventh Circuit's decision
in Jordan v. Mosley, 487 F.3d 1350, 1354 (11th Cir. 2007), demands
a different result is misguided.  Dkt. No. 84 at 25.  Plaintiff
correctly notes that Jordan explains, "[i]n this Circuit, a non-
arresting officer who instigates or causes an unlawful arrest can
still be liable under the Fourth Amendment."  Jordan, 487 F.3d at
1354 (footnote omitted) (citing Rodriguez v. Ritchey, 539 F.2d
394, 400 (5th Cir. 1976)).  However, the facts in Jordan are
distinguishable from this case.  There, the arresting officer, in
seeking a warrant, "relied entirely" on the non-arresting
officer's story, "did not further investigate the incident, and
did not learn the details until much later."  Id. at 1353.
Therefore, there was a causal connection between the non-arresting

officer and the plaintiff's arrest. In this case, however, Plaintiff has presented no "proof of an affirmative causal connection" between Defendant Martin's complaint to the officers and Plaintiff's ultimate arrest, see Brown, 608 F.3d at 737, particularly in light of Officer Stewart's independent investigation before Plaintiff's arrest and uncontroverted evidence that the decision to arrest Plaintiff "rested entirely" with Officer Stewart. Dkt. No. 76 at 72:1-5; see generally Dkt. No. 69-5.

Finally, Plaintiff has presented no evidence that Defendant Martin "was part of the chain of command authorizing [Plaintiff's arrest]." Brown, 608 F.3d at 737 (affirming the grant of qualified immunity, assuming a constitutional violation occurred, where the non-arresting officer had no supervisory control over the arresting officer). That Defendant Martin may have asked for Plaintiff's arrest and that Defendant Martin was present during Plaintiff's arrest "is not enough" to establish an affirmative causal connection between Defendant Martin's actions and Plaintiff's ultimate arrest.[13]

---

[13] Notably, both Jordan and Brown involve officers who were non-arresting officers, but both officers ultimately had arrest powers within the relevant jurisdiction. Here, Plaintiff has not shown that Defendant Martin even has arrest powers such that either case is applicable here.

Accordingly, because Plaintiff fails to show an affirmative causal connection between Defendant Martin's actions and Plaintiff's arrest, her Fourth Amendment false arrest claim fails, and Defendants are entitled to summary judgment on this claim.

**CONCLUSION**

After close examination, the Court finds dispositive that the remaining Defendants did not draft or issue the Criminal Trespass Warning.  For the foregoing reasons, Defendants' motion for summary judgment, dkt. no 69, is **GRANTED**.  There being no claims remaining in this action, the Clerk is **DIRECTED** to **CLOSE** this case.

**SO ORDERED**, this 31st day of August, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA